PAIGE M. TOMASELLI (State Bar No. 237737)
SYLVIA SHIH-YAU WU (State Bar No. 273549)
Center for Food Safety
303 Sacramento Street, 2nd Floor
San Francisco, CA 94111
Phone: (415) 826-2770
Fax: (415) 826-0507
Emails: ptomaselli@centerforfoodsafety.org
swu@centerforfoodsafety.org

*Counsel for Plaintiffs*

**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

CENTER FOR FOOD SAFETY; BEYOND PESTICIDES; EQUAL EXCHANGE; FOOD & WATER WATCH; LA MONTANITA CO-OP; ORGANIC SEED GROWERS AND TRADE ASSOCIATION; THE CORNUCOPIA INSTITUTE; NORTHEAST ORGANIC DAIRY PRODUCERS ALLIANCE; PCC NATURAL MARKETS; GREENSWARD/NEW NATIVES LLC; FREY VINEYARDS, LTD.; ORGANIC CONSUMERS ASSOCIATION; MAINE ORGANIC FARMERS AND GARDENERS ASSOCIATION; and OHIO ECOLOGICAL FOOD AND FARM ASSOCIATION,

*Plaintiffs*,

v.

TOM VILSACK, SECRETARY OF THE UNITED STATES DEPARTMENT OF AGRICULTURE; ANNE ALONZO, ADMINISTRATOR OF THE AGRICULTURAL MARKETING SERVICE; and MILES MCEVOY, DEPUTY ADMINISTRATOR OF THE NATIONAL ORGANIC PROGRAM,

*Defendants*.

Case No. 3:15-cv-1590

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**COMPLAINT**

Plaintiffs Center for Food Safety, Beyond Pesticides, Equal Exchange, Food & Water Watch, La Montanita Co-op, Organic Seed Growers and Trade Association, The Cornucopia Institute, Northeast Organic Dairy Producers Alliance, PCC Natural Markets, Greensward/New Natives LLC, Frey Vineyards, Ltd., Organic Consumers Association, Maine Organic Farmers and Gardeners Association, and Ohio Ecological Food and Farm Association, on behalf of themselves and their members, allege as follows:

**NATURE OF ACTION**

1. This is a civil action for declaratory and injunctive relief. Plaintiffs seek declaration that Defendants violated federal laws, as set forth in the causes of action below, in developing and promulgating the September 16, 2013, Federal Register notice, *National Organic Program–Sunset Process* (Sunset Notice), without regard to rulemaking procedures under the Administrative Procedure Act (APA) and standards of the Organic Foods Production Act (OFPA).

2. The United States Department of Agriculture (USDA), under Defendants Secretary Vilsack, Administrator Alonzo, and Deputy Administrator McEvoy's supervision and control, issued a substantive rule governing the standards and procedures of OFPA's National List material review and renewal process, known as Sunset Review. By law, each material on the National List, be it an exempted synthetic or prohibited natural, must be considered invalid after five years unless the National Organic Standards Board reviews the material utilizing the procedures proscribed by OFPA and the Secretary of the USDA renews the placement of the material on the National List. Because USDA did not promulgate the Sunset Notice through the proper advanced notice and public comment procedures mandated under section 553 of the APA and required under OFPA, the Sunset Notice threatens the integrity of the National Organic Program, constitutes arbitrary and capricious actions on the part of the Agency, and must be corrected.

3. This suit specifically alleges that the Sunset Notice is a substantive rule that injures organic consumers, farmers, and producers, and impacts the rights of interested persons

by weakening the integrity of the National Organic Program and degrading the quality of organically labeled food. USDA must provide both advanced publication of the proposed rule and opportunity for public comment, as required under sections 553(b) and 553(c) of the APA, and have failed to do so. Defendants' decision to promulgate the Sunset Notice without providing advanced notice of the proposed rule and opportunity for public comment violates the APA.

4. Defendants' violation of the rulemaking requirements under the APA also violates OFPA, by failing to implement a primary purpose of the organic law: consistent organic standards that abide by the transparency and public involvement requirements of OFPA.

5. Plaintiffs seek a declaration that through the promulgation of the Sunset Notice without advanced publication in the Federal Register and opportunity for public comment, Defendants violated the APA and OFPA. Plaintiffs seek invalidation of the September 16, 2013, Sunset Notice and reinstatement of the previous sunset rules and procedures pending APA notice and comment review. Finally, Plaintiffs seek attorneys' fees and costs pursuant to 28 U.S.C. § 2412(d).

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgment), and 5 U.S.C. § 702 (APA).

7. Venue in this Court is proper under 28 U.S.C. § 1391(e) because no real proprety is involved and because one or more Plaintiffs resides in this judicial district.

## PARTIES AND STANDING

***Plaintiffs***

8. Plaintiff Center for Food Safety (CFS) is a national nonprofit organization with more than 650,000 members nationwide. CFS has offices in Washington, D.C., San Francisco, CA, Portland, OR, and Honolulu, Hawai‘i, with members in nearly every state, including organic farmers, producers, retailers, consumers, and certifiers. CFS and its members are being, and will be, adversely affected by USDA's actions.

9. CFS seeks to protect human health and the environment by advocating for consumers' right to know how food is produced and what is contained within it. A key part of this advocacy effort is the education of the public concerning organic food production methods and the integrity of the organic label. CFS also provides public oversight to the organic regulatory program to ensure organic integrity.

10. To achieve its goals, CFS disseminates to government agencies, members of Congress, and the general public a wide array of educational and informational materials addressing organic standards and food supply issues. These materials include, but are not limited to, reprints of news articles, policy reports, legal briefs, press releases, action alerts, and fact sheets. CFS also sends out action alerts to its True Food Network. These action alerts generate public involvement, education, and engagement with governmental officials on issues related to the National Organic Program, National Organic Standards Board, and other issues affecting the organic label and the sustainable food system it advances. Collectively, the dissemination of this material has made CFS an information clearinghouse for public involvement and governmental oversight of the organic label.

11. When necessary, CFS also engages in public interest litigation challenging agricultural practices that harm human health and the environment—such as pesticide use and genetically engineered crops—or impact farmers, its members, and the public interest. Many of CFS's past lawsuits involved organic issues and agricultural interests. For example, CFS filed an amicus brief in *Harvey v. Veneman*, 396 F.3d 28 (1st Cir. 2005), litigation that challenged provisions of the National Organic Program Final Rule as inconsistent with OFPA and a dilution of its organic standards.

12. USDA's failure to comply with the APA's rulemaking procedures and the resulting Sunset Notice injures CFS members by weakening organic integrity, creating inconsistent organic production standards, and demonstrating arbitrary and capricious application of administrative functions.

13. Plaintiff Beyond Pesticides is a national nonprofit organization based out of Washington, D.C. with members in fifty states and the District of Columbia, including

California. Beyond Pesticides and its members are being, and will be, adversely affected by Defendants' decisions to promulgate OFPA rules without due regard for mandatory rulemaking procedures and the transparency and public engagement requirements established under OFPA. Beyond Pesticides promotes safe air, water, land, and food, and works to protect public health and the environment by encouraging a transition away from the use of toxic pesticides.

14. With Beyond Pesticides' resources made available to the public on a national scale, Beyond Pesticides contributes to environmentally conscious agricultural practices and a significant reduction in unnecessary pesticide use, much of which is achieved through the support and promotion of the organic program.

15. Beyond Pesticides' members include organic consumers, farmers, certifiers, retailers, and processors who aim to expand the organic program and maintain its integrity. It is the goal of Beyond Pesticides to educate the public on the important health and environmental benefits of organic food production and generate support for sound ecology-based regulatory and management systems.

16. Many of Beyond Pesticides' members rely on the integrity of the organic label in their work and day-to-day lives, from the food they purchase and feed to their children to those whose livelihood depends on production of crops and food with strict adherence to the organic standards. Arbitrary and capricious rulemaking injures these Beyond Pesticides' members and others by weakening the integrity of organic.

17. Plaintiff Equal Exchange is a national mission-based for-profit food company based in West Bridgewater, MA with regional offices in St. Paul, MN and Portland, OR. Equal Exchange has national and international distribution of fair trade products, and sources the ingredients for those products from organic farmers on several continents. Equal Exchange, its multiple shareholders, and consumers of Equal Exchange products are being, and will be, adversely affected by Defendants' decisions to promulgate OFPA rules without due regard for mandatory rulemaking procedures and the transparency and public engagement requirements established under OFPA.

18. Equal Exchange's mission is to build long-term trade partnerships that are economically just and environmentally sound, to foster mutually beneficial relationships between farmers and consumers and to demonstrate, through our success, the contribution of worker co-operatives and Fair Trade to a more equitable, democratic and sustainable world. Organic sales account for 95% of Equal Exchange's revenue; sales in 2013 were $56.1 Million. Much of our success since our inception in 1986 is directly attributable to the demand for organic food in the marketplace.

19. All of Equal Exchange's stakeholders rely on the integrity of the organic label in their work and day-to-day lives. Many of Equal Exchange's farmer partners have made a considerable investment to adopt organic production methods, and the additional premium they receive from certified organic sales is vital to their success. Likewise, Equal Exchange's consumers rely on strict adherence to the organic standards in the decisions they make with regard to food purchases. Arbitrary and capricious rulemaking injures these farmers and consumers by weakening the integrity of organic.

20. Plaintiff Food & Water Watch (FWW) is a national nonprofit organization with more than 80,000 members and 780,000 supporters nationwide. FWW has offices in Washington, D.C., San Francisco, CA, and fourteen other states.

21. FWW works to create a healthy future for our families and for generations to come, with access to wholesome food, clean water, and sustainable energy for everyone. A key part of FWW's work on food involves working through the regulatory system to protect the integrity of the USDA organic label, in order to create a credible standard for consumers in the marketplace.

22. FWW communicates with federal agencies, members of Congress and state legislatures, other nonprofit organizations, the media, and the general public about many food policy issues, including the USDA's organic standards. FWW communicates with members and supporters about opportunities to comment during public comment periods on many food issues, including rulemaking on USDA's organic standards and the public comment period process for the National Organic Standards Board.

23. USDA's Sunset Notice, and the Agency's failure to comply with APA rulemaking procedures in making that policy change, injures FWW's members and supporters by weakening the integrity of the organic standards, adding inconsistency into the standards that consumers rely upon to determine if the organic label is credible. This demonstrates arbitrary and capricious application of administrative functions.

24. Plaintiff La Montanita Co-op is a community-owned cooperative with six retail locations in Albuquerque, Santa Fe, and Gallup, New Mexico. La Montanita Co-op also operates a food hub warehouse that distributes products for family farmers, ranchers and organic food producers in a three hundred mile radius around Albuquerque. La Montanita Co-op, its approximately 16,500 member-owners and over 400 local food-producing partners are being, and will be, adversely affected by Defendants' decisions to promulgate OFPA rules without due regard for mandatory rulemaking procedures and the transparency and public engagement requirements established under OFPA.

25. La Montanita Co-op's mission is to provide healthy food for local communities and to restore and sustain the local food system while building economic stability for the food-producing community throughout the Southwestern United States. La Montanita's goal of providing fresh, fair, and locally produced food requires the development of long-term partnerships that are economically just and environmentally sound, throughout the value chain, from producer to consumer. Organic sales are the backbone of La Montanita's organization and La Montanita is the largest community-owned natural and organic food business in New Mexico. Approximately 99% of all our fresh fruit and vegetable sales are of organic product and we regularly stock and sell approximately 3000 individual certified organic products. In 2014, La Montanita's revenues were $38 Million. La Montanita directly employs nearly 300 people, and provides income for numerous others. La Montanita's success since its inception in 1976 is directly attributable to the demand for organic food in the marketplace.

26. La Montanita's member-owners and non-member shoppers rely on the integrity of the certified organic label as they make their consumer choices. Many of La Montanita's farmer partners have made a considerable investment to adopt organic production methods, and the

additional premium they receive from certified organic sales is vital to their success. Strict adherence to the organic standards and the rules provided in the National Organic Program provide the greatest security for shoppers to make informed food and personal care choices. The reliability of organic certification requirements and people's trust in them directly impacts the well-being of La Montanita's business. Any weakening of the integrity and transparency of organic certification through arbitrary and capricious rulemaking injures the many thousands of La Montanita Co-op's stakeholders, and tens of millions of food producers and consumers across the nation.

27. Organic Seed Growers and Trade Association (OSGATA) is the farmer-controlled national nonprofit membership trade organization for the organic seed community. OSGATA's membership is comprised of certified organic farmers, certified organic seed farmers, certified organic seed companies, organic seed breeders, affiliate organizations and individuals dedicated to the advancement of a high quality and independently certified organic seed supply. Headquartered in Washington, Maine, OSGATA's membership spans the United States.

28. OSGATA works to protect, promote, and develop the organic seed trade and its growers. Its goal is to assure that the organic community has access to excellent quality, resilient, certified organic seed, free of transgenic contaminants and adapted to the diverse needs of local organic agriculture. The integrity of the organic label is vital to the livelihoods and viability of OSGATA's certified organic members.

29. The Organic Consumers Association (OCA) is an online and grassroots nonprofit 501(c)3 public interest organization campaigning for health, justice, and sustainability. OCA deals with crucial issues of food safety, industrial agriculture, genetic engineering, children's health, corporate accountability, Fair Trade, environmental sustainability, and other key topics. OCA is the only organization in the United States focused exclusively on promoting the views and interests of the nation's estimated fifty million organic and socially responsible consumers.

30. OCA represents over 2,000,000 members, subscribers, supporters, and volunteers, including several thousand businesses in the natural foods and organic marketplace. Our United

States and international policy board is broadly representative of the organic, family farm, environmental, and public interest community.

31. OCA was formed in 1998 in the wake of the mass backlash by organic consumers against the USDA's controversial proposed national regulations for organic food. Through OCA's Safeguard Organic Standards campaign, as well as the work of allies in other organizations, the organic community has been able to mobilize hundreds of thousands of consumers to participate in the National Organic Standards Board process and submit public comments to USDA's National Organic Program to preserve strict organic standards.

32. USDA's arbitrary and capricious violation of APA rulemaking procedures and the improper Sunset Notice deprives OCA's members of the opportunity to be heard at the National Organic Standards Board and USDA's National Organic Program in support of organic integrity and strong organic production standards.

33. Plaintiff The Cornucopia Institute (Cornucopia) is a national nonprofit organization engaged in farm and food policy research and education. Cornucopia's members come from nearly every state and include organic farmers, direct market farmers, consumers, retailers, businesses, processors, and certifiers. Cornucopia is believed to have more certified organic farmer members than any similar organization. Three current members of Cornucopia's board of directors are former members of the National Organic Standards Board. Cornucopia is incorporated in Wisconsin and has staff in six states.

34. Cornucopia works to educate farmers, consumers, and the media about issues affecting the integrity of organic food and agriculture. As detailed in its organizational purpose, Cornucopia will engage in educational activities supporting the ecological principles and economic wisdom underlying sustainable and organic agriculture.

35. One primary piece of this work concerns oversight and watchdogging of government and corporate activities in organic food and agriculture. In particular, this includes the careful monitoring of and reporting on activities of the USDA, its National Organic Program, and the National Organic Standards Board.

36. Cornucopia's staff regularly attend meetings of the National Organic Standards Board and provide detailed analysis of issues before the board, including public testimony. Cornucopia also works to involve the public in these meetings, engaging consumers, farmers, businesses, and retailers to attend and testify in support of the integrity of organic food and agriculture. Decisions and initiatives from the National Organic Standards Board are broadly disseminated to the organic community, general public, and the media through news releases, organizational publications, educational forums, and action alerts.

37. Members of Cornucopia depend on the integrity of organic food and agriculture for their livelihoods and/or food for their families. USDA's change to the Sunset Review process, in addition to being both arbitrary and capricious, threatens to injure the public perception of organic integrity and harm Cornucopia's farmer, consumer, retailer, processor, and certifier members.

38. Plaintiff Northeast Organic Dairy Producers Alliance (NODPA) is a national nonprofit membership organization based in Deerfield, Massachusetts. NODPA is the largest organic dairy farmer organization in the country with a membership of eight hundred and thirty six organic dairy farmers in the Eastern United States. NODPA is not aligned with any one processor or cooperative and therefore is able to represent the views and needs of many different farmers. NODPA and its members are being, and will be, adversely affected by USDA's actions.

39. NODPA's mission is to "enable organic dairy family farmers, situated across an extensive area, to have informed discussion about matters critical to the well-being of the organic dairy industry as a whole." A key part of this mission is the education of the public concerning organic food production methods and integrity of the organic label. The integrity of the organic label is essential for the economic sustainability of organic dairy farmers. NODPA serves its organic dairy family farmers by providing oversight of the organic regulatory program to ensure organic integrity.

40. To achieve its goals, NODPA provides a wide range of resources and services, such as the hosting and moderation of the Odairy list serve, the six-times per year print newsletter, monthly e-newsletter, website management, annual Field Days, and Washington

representation on behalf of all organic dairy farm families through NODPA's membership in the National Organic Coalition. NODPA regularly provides comments to the National Organic Standards Board on issues that are important to farmers, and attends many of their meetings. Collectively, the dissemination of this material has made NODPA an information clearinghouse for organic farmers' involvement and governmental oversight of the organic label.

41. USDA's failure to comply with the APA rulemaking procedures and the resulting Sunset Notice injures NODPA's members by weakening organic integrity, creating inconsistent organic production standards, and demonstrating arbitrary and capricious application of administrative functions, which undermine consumer trust in the label. Consumers have many choices in the marketplace and NODPA members, most of whom sell their milk on the wholesale market, rely on consumers' trust in the integrity of the process and administration of the organic label.

42. PCC Natural Markets (PCC) is the nation's largest consumer-owned grocery retailer. PCC has ten stores in Seattle and adjacent cities, and nearly 55,000 active member/owners. PCC's business is very dependent on organic farmers, processors, certifiers, and consumers. They are—and will be—adversely affected by USDA's decision to issue rules without regard for the rulemaking process mandated by OFPA.

43. PCC Natural Markets is directed by its consumer-owners to create a sustainable environment where the organic supply chain can thrive. Much of PCC's business is built upon trust in the process for organic integrity. Our members and shoppers are engaged and well-educated in organic food and farming concerns. PCC members submitted ten percent of the entire nation's public comments to USDA during the run-up to national organic standards. They care about organic standards and demand organic foods with high integrity. PCC is a certified organic retailer to ensure organic integrity when handling fresh produce, meat, deli cheese, juice bar, and espresso bar ingredients.

44. Educating staff, members, and the general public about food production and practices has been part of PCC Natural Markets' business model for decades. PCC Natural Markets believes food production practices and the process to establish rules regulating organic

foods should be fully transparent. PCC Natural Markets believes OFPA's mandate requiring full notice and opportunity for public comment before rulemaking is fundamental to the high level of consensus needed to ensure both credibility of the organic label and public support for organic products.

45. PCC advocates for the consumer's interest in organic standards through an array of multi-media venues, including published articles and newsletters sent to member homes, in-store food education tours, an award-winning cooking class program, television cooking segments, radio ads, and a robust social media program. As events warrant, PCC challenges practices or proposals that harm the organic supply chain and/or human and environmental health. As events warrant, PCC submits comments during public comment periods on issues affecting transparency and integrity of food standards.

46. USDA's failure to comply with the APA rulemaking procedures demonstrates arbitrary and capricious disregard for administrative functions and injures PCC by weakening organic integrity.

47. Greensward/New Natives LLC is a certified organic farm based in Aptos, CA. Greensward/New Natives LLC has been certified organic by California Certified Organic Farmers continuously since 1983. Greensward/New Natives LLC is, by USDA's definition, a mid-sized farm. Greensward/New Natives LLC and its customers are being, and will be, adversely affected by Defendants' decisions to promulgate OFPA rules without due regard for mandatory rulemaking procedures and the transparency and public engagement requirements established under OFPA. Greensward/New Natives LLC has an unwavering commitment to organic practices and the rule of law embodied in OFPA, as evidenced by its early adoption of organic principles and embracing of organic certification even before OFPA came into being.

48. Frey Vineyards, Ltd. is a winery in California producing premium organic and biodynamic wines since 1980. Frey Vineyards farms about 300 acres of winegrapes and other crops and livestock, including grains, chickens and cows. Frey Vineyards has been active in promoting organic production methods for many years. For example, members of Frey Vineyards have been organic farm inspectors and helped draft processor standards that became

part of USDA's National Organic Program. Frey Vineyards has defended organic integrity at the National Organics Standards Board by testifying against a petition seeking to allow a prohibited substance to be added to the National Organics Program's list of allowed substances. It has come to Frey Vineyards' attention that USDA is proposing weakening Sunset Notice provisions by bypassing OFPA rulemaking procedures. This would obviously compromise organic label integrity, and would seriously undermine consumer trust in the organic regulatory program and organic products. This rapidly growing agricultural sector derives much of its strength from public trust in the maintenance and transparency of the regulatory system which gives consumers trust and confidence that the products they are buying meet the standards of integrity they have come to expect. Bypassing and undermining these regulatory procedures to lessen input into the process cannot inspire confidence in the system, and will lead to consumer mistrust.

49. Plaintiff Maine Organic Farmers and Gardeners Association (MOFGA) is a nonprofit organization based in Unity, Maine with more than 11,000 dues-paying members. MOFGA membership includes certified organic farmers and gardeners, organic consumers, producers, retailers and certifiers. Our members are primarily residents of Maine, but MOFGA has members in many states around the nation as well.

50. MOFGA works to help farmers and gardeners grow organic food, fiber, and other crops; protect the environment; recycle natural resources; increase local food production; support rural communities; and illuminate for consumers the connection between healthful food and environmentally sound farming practices.

51. To achieve its goals, MOFGA certifies organic farmers according to USDA rules and regulations, trains organic farmers in production methods and certification requirements, provides educational materials to organic consumers to help guide their purchasing decisions and advises others regarding the positive role organic food production and consumption can play in creating a healthful food supply.

52. USDA's unwillingness to act in accordance with the APA rulemaking procedures and the resulting Sunset Notice injures MOFGA members by weakening organic integrity,

creating inconsistent organic production standards, and demonstrating arbitrary implementation of administrative functions.

53. The Ohio Ecological Food and Farm Association (OEFFA) is a 501(c)3 nonprofit organization based in Columbus, Ohio. From 1981 until 2002, OEFFA offered organic certification services for Ohio's organic producers and since 2002, its sister organization, OEFFA Certification has done so as a USDA accredited certifier. OEFFA is a broad-based membership organization that includes 3400 certified organic farmers, consumers, backyard gardeners, sustainable farmers, homesteaders, and others. OEFFA and its members oppose Defendants' disregard for mandatory rulemaking procedures, including advance notice and comment, as required by the Administrative Procedure Act.

54. Plaintiff organizations have standing to bring this action on behalf of themselves and their members. Members of Plaintiff organizations depend on the integrity of the organic label and suffer injury when it is weakened. The above-described interests of the Plaintiff organizations and their members have been and will continue to be adversely affected and irreparably injured by Defendants' decision to issue the Sunset Notice without regard to rulemaking procedures.

***Defendants***

55. Defendant Tom Vilsack is the Secretary of USDA. The Secretary is the official ultimately responsible for the National Organic Program and for compliance with all OFPA and APA laws and regulations. The Secretary is sued in his official capacity.

56. Defendant Anne Alonzo is the Administrator of USDA's Agricultural Marketing Service. She is legally responsible for overseeing USDA's Agricultural Marketing Service, which administers several programs to support U.S. agriculture, including the National Organic Program. As Administrator of USDA's Agricultural Marketing Service, she is legally responsible for the National Organic Program and the Program's compliance with all OFPA and APA laws and regulations. The Administrator is sued in her official capacity.

57. Defendant Miles McEvoy is the Deputy Administrator of the National Organic Program. He is legally responsible for overseeing National Organic Program activities, including the National Organic Standards Board. The Deputy Administrator is sued in his official capacity.

## LEGAL BACKGROUND

***Organic Foods Production Act (OFPA)***

58. With the passage of OFPA, Congress created a national organic production framework that aimed to achieve three general purposes: (1) establish national standards governing the marketing of certain agricultural products as organically produced products, (2) assure consumers that organically produced products meet consistent standards; and (3) facilitate interstate commerce in fresh and processed food that is organically produced. 7 U.S.C. § 6501.

59. To achieve these purposes, OFPA established three baseline standards that an agricultural product must satisfy to be sold or labeled as organic. 7 U.S.C. § 6504. These fundamental organic standards remain unchanged. The first of these standards requires that organic agricultural products must "have been produced and handled without the use of synthetic chemicals, except as otherwise provided in this chapter." 7 U.S.C § 6504(1). The second standard prohibits organic production on land where synthetic chemicals have been applied in the previous three years, and the third requires compliance with an organic production plan. 7 U.S.C. § 6504 (2) - (3).

60. The first of the three organic standards—the "no synthetics in organic" rule—allows for limited exceptions as provided for in OFPA. The primary exception provided for in OFPA is found in the mandate that the Secretary establish a National List of both exempted synthetic substances and prohibited natural substances. 7 U.S.C. § 6517(a)-(b). Under OFPA, only if a substance undergoes review and is then approved for addition to the National List, can it be used in organic production—despite the fact that it is inherently not organic. *Id.*

61. OFPA requires that substances undergo rigorous review before inclusion on the National List. The National List may provide for the use of synthetic substances and prohibited natural substances only if the Secretary determines the substance would not be harmful to human health or the environment, the substance is necessary because of the unavailability of wholly

natural substitute products, and the substance is consistent with organic farming and handling. 7 U.S.C. § 6517(c)(1)(A)(i)-(iii).

62. Specific exemptions on the National List must be developed using the "Procedures for Establishing the National List." 7 U.S.C. § 6517(c)(1)(C). Procedures for establishing the National List require that the Secretary shall base the National List on "a proposed national list or proposed amendments to the National List developed by the National Organic Standards Board." 7 U.S.C. § 6517(d)(1).

63. OFPA procedures for establishing the National List also state that the Secretary "may not include exemptions for the use of specific synthetic substances in the National List other than those exemptions contained in the Proposed National List or Proposed Amendments to the National List." 7 U.S.C. § 6517(d)(2). Thus, even if the Secretary believes a synthetic chemical should be added to the National List, he cannot do so unless the National Organic Standards Board has included that chemical on its Proposed National List or Proposed Amendments to the National List.

64. Under OFPA both the establishment and amendment of the National List require transparency and public engagement. The statutory procedures for establishing the National List state that the Secretary must publish the Proposed National List or any Proposed Amendments to the National List in the Federal Register and seek public comment on such proposals. 7 U.S.C. § 6517(d)(4). The Federal Register publication must include Changes to the Proposed National List or Proposed Amendments that are recommended by the Secretary, meaning that the public must be aware of both the original recommendations of the National Organic Standards Board and the Secretary's amendments to those recommendations. *Id.*

65. Neither the Secretary nor the National Organic Standards Board can elect whether to carry out the duties assigned to each concerning the National List. It is a mandatory duty of the National Organic Standards Board to develop the Proposed National List or Proposed Amendments to the National List for submission to the Secretary in accordance OFPA's section governing the National List. 7 U.S.C. § 6518(2).

66. Just as OFPA provides for specific and mandatory procedures and standards in establishing the National List, OFPA also places a time limit on the exception granted to the substances placed on the National List and which are inherently contrary to the "no synthetics in organic" rule. Subtitled, "Sunset provision," this provision imposes a five-year limit on a National List material's exemption. The Sunset provision reads: "No exemption or prohibition contained in the National List shall be valid unless the National Organic Standards Board has reviewed such exemption or prohibition as provided in this section within 5 years of such exemption or prohibition being adopted or reviewed and the Secretary has renewed such exemption or prohibition." 7 U.S.C. § 6517(e).

67. Thus after five years a substance is no longer exempted and cannot be used in organic production unless two actions occur: (1) the National Organic Standards Board reviews the substance as provided in the National List section of OFPA, and (2) the Secretary decides to renew a material's placement on the National List. *Id*.

***Administrative Procedure Act***

68. The APA requires federal agencies to provide notice of proposed rulemaking through publication in the Federal Register. 5 U.S.C. § 553(b). Agencies must also provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." 5 U.S.C. § 553(c).

69. The APA grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . ." 5 U.S.C. § 702.

70. Under the APA, courts "shall compel agency action unlawfully withheld or unreasonably delayed," *id*. § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id*. § 706(2)(A). Courts may only review a final agency action, *id*. § 704, and "agency action" includes a "failure to act," *id*. § 551(13).

## FACTUAL BACKGROUND

***OFPA and the National List***

71. In 1990, Congress passed OFPA, 7 U.S.C. §§ 6501-6523, which tasked the Secretary of Agriculture with the establishment of the National Organic Program and developing the required underlying regulations. Shortly after OFPA's passage the Secretary appointed the first members of the statutorily-mandated National Organic Standards Board, an advisory committee generally responsible for assisting the Secretary in the development of standards for substances to be used in organic production and advising the Secretary on any other aspects of the implementation of OFPA. *See* 7 U.S.C. § 6518(a).

72. Working with the National Organic Standards Board, USDA published in the Federal Register the first proposed OFPA rule (Organic Rule) in 1997.[1] Included in the proposed Organic Rule of 1997 was a review of the activities of the National Organic Standards Board in developing the Proposed National List:

> The Board has reviewed approximately 170 substances, including botanical pesticides as required in section 2119(k)(4) of the OFPA (7 U.S.C. 6518(k)(4)), for possible placement on the National List, and the Board used technical advisory panels to provide scientific evaluation of the materials considered in its review of the substances.
>
> The [National Organic Standards Board]'s initial recommendations were presented to the Secretary on August 1, 1994. The [National Organic Standards Board] has continued to make recommendations and has submitted 30 addenda to its initial recommendations.[2]

73. Despite the National Organic Standards Board's work on developing the Proposed National List, the National Organic Program's 1997 draft of the Organic Rule and the National List incorporated within the draft Organic Rule included substances not recommended by

---

[1] National Organic Program, 62 Fed. Reg. 65, 850 (proposed Dec. 16, 1997).

[2] *Id.* at 65,851; *see also* National Organic Program, NOSB Final Recommendations, http://www.ams.usda.gov/AMSv1.0/ams.fetchTemplateData.do?template=TemplateN&navID=NationalOrganicProgram&leftNav=NationalOrganicProgram&page=NOSBFinalRecommendations&description=NOSB%20Final%20Recommendations.

National Organic Standards Board or included in the Board's Proposed National List, an action which spurred an outpouring of public comments and organic community backlash.[3]

74. In response to the public comments, the National Organic Program revised its proposed Organic Rule and published an amended version of it in the Federal Register on March 13, 2000.[4] Included in the National Organic Program's explanation for the revisions was the statement that "[t]he first proposal included some substances on the National List that were not recommended by the National Organic Standards Board. This proposal contains no substances on the approved list that were not found in the National Organic Standards Board's recommendations."[5]

75. After receiving public comments on the revised proposed Organic Rule, the National Organic Program promulgated the final Organic Rule in December 2000 with still additional requests for public comments.[6]

76. Included in the final Organic Rule was the first National List with an effective date of February 20, 2001. This effective date would be corrected in a later Federal Register notice, amending it to April 21, 2001.[7]

77. Described within the final Organic Rule was a general review of the National Organic Standards Board's process and review standards for evaluating substances petitioned to be included on the National List. Guidance on how the public should petition a substance to be

---

[3] Gene Rowson, Congressional Research Service, *98-264 – Organic Foods and the Proposed Federal Certification and Labeling Program*, Sept. 8, 1998, http://cnie.org/nle/crs/abstract.cfm?NLEid=391.

[4] National Organic Program, 65 Fed. Reg. 13,512 (proposed March 13, 2000) (to be codified at 7 C.F.R. pt. 205), https://www.federalregister.gov/articles/2000/03/13/00-5723/national-organic-program.

[5] *Id.* at 13,513.

[6] National Organic Program, 65 Fed. Reg. 80,548 (Dec. 21, 2000) (to be codified at 7 C.F.R. pt. 205), https://www.federalregister.gov/articles/2000/12/21/00-32257/national-organic-program; National Organic Program; Correction of the Effective Date Under Congressional Review Act (CRA), 66 Fed. Reg. 15,619 (March 20, 2001), https://www.federalregister.gov/articles/2001/03/20/01-6836/national-organic-program-correction-of-the-effective-date-under-congressional-review-act-cra.

[7] National Organic Program, 65 Fed. Reg. 80,548 National Organic Program; Correction of the Effective Date Under Congressional Review Act (CRA), 66 Fed. Reg. 15619.

added to the National List, however, was published in a separate Federal Register notice.[8] The guidance, prepared in a questions and answers format, addressed the kinds of information should be included in a petition, where the petition should be directed, and what criteria the National Organic Standards Board must apply according to OFPA in evaluating a petition.

78. Despite the final Organic Rule effective date of April 21, 2001, the National List's effective date did not commence until October 21, 2002.[9]

***Sunset Review***

79. Three years later, on June 17, 2005, the National Organic Program published the First Advanced Notice of Proposed Rulemaking (ANPR) in the Federal Register concerning Sunset Review of materials set to expire on October 21, 2007 (the first Sunset Review ANPR).[10] The National Organic Program requested public comment on this ANPR. Contained within the first Sunset Review ANPR is the following statement:

> Expiration of the exempted or prohibited use of substances is provided for under the OFPA's sunset provision. This ANPR announces the sunset of 165 exempted and 9 prohibited substances currently on the National List, which became effective October 21, 2002. This ANPR establishes October 21, 2007, as the date by which the Sunset Review and renewal process must be concluded and also begins the public comment process on whether the existing specific exemptions or prohibitions on the National List should be continued. This ANPR discusses how the National Organic Program will manage the Sunset Review and renewal process.[11]

---

[8] National Organic Program, Submission of Petitions for Evaluation of Substances for Inclusion on or Removal From the National List of Substances Allowed and Prohibited in Organic Production and Handling, 65 Fed. Reg. 43,259 (July 13, 2000) (notice of guidelines and call for national list petitions), https://www.federalregister.gov/articles/2000/07/13/00-17689/submission-of-petitions-for-evaluation-of-substances-for-inclusion-on-or-removal-from-the-national.

[9] National Organic Program, Sunset Review, 70 Fed. Reg. 35,177 (June 17, 2005) (ANPR with req. for comment), https://www.federalregister.gov/articles/2005/06/17/05-12007/national-organic-program-sunset-review.

[10] *Id.* ("As required by the Organic Foods Production Act of 1990 (OFPA), the allowed use of 165 synthetic and non-synthetic substances in organic production and handling will expire on October 21, 2007. In addition, prohibitions on the use of 9 non-synthetic substances will expire in organic production on October 21, 2007.")

[11] National Organic Program, Sunset Review, 70 Fed. Reg. 35,177 (June 17, 2005) (ANPR with req. for comment), https://www.federalregister.gov/articles/2005/06/17/05-12007/national-organic-program-sunset-review.

The ANPR goes on to describe the review and renewal process and substances facing expiration, with specific subsections included in the ANPR subtitled, "Sunset Process" and "Guidance on Submitting Your Comments."[12]

80. After receiving comments on the first Sunset Review ANPR and conducting multiple public National Organic Standards Board meetings, the National Organic Program published a proposed rule to implement the National Organic Standards Board recommendations concerning the first Sunset Review on March 6, 2007.[13] Discussed within the proposed rule was a review of the number and nature of public comments received after publication of the first Sunset Review ANPR. The subject matter of the comments included not only discussion of individual substances, but also the process used to review those substances.[14]

81. A final rule on the first Sunset Review followed on October 16, 2007, wherein consistent with the recommendations from the National Organic Standards Board, the National Organic Program renewed 165 exemptions and prohibitions on the National List (along with any restrictive annotations) and removed three exemptions.[15]

82. Including the first Sunset Review, five Sunset Reviews have occurred between 2005 and 2013,[16] as well as a nutrient vitamin Sunset Review.[17] With each of these five Sunset

---

[12] *Id.*

[13] National Organic Program, Sunset Review, 72 Fed. Reg. 9872 (proposed March 6, 2007) (to be codified at 7 C.F.R. pt. 205), https://www.federalregister.gov/articles/2007/03/06/E7-3829/national-organic-program-sunset-review.

[14] *Id.*

[15] National Organic Program, Sunset Review , 72 Fed. Reg. 58,469 (Oct. 16, 2007), https://www.federalregister.gov/articles/2007/10/16/E7-20326/national-organic-program-sunset-review.

[16] *See id.* and National Organic Program, Sunset Review (2008), 73 Fed. Reg. 59,479(Oct. 09, 2008), https://www.federalregister.gov/articles/2008/10/09/E8-24114/national-organic-program-nop-sunset-review-2008; National Organic Program, Sunset Review (2011), 76 Fed. Reg. 46,595 (Aug. 03, 2011), https://www.federalregister.gov/articles/2011/08/03/2011-19659/national-organic-program-nop-sunset-review-2011; National Organic Program, Sunset Review (2012)77 Fed. Reg. 33,290 (June 06, 2012), https://www.federalregister.gov/articles/2012/06/06/2012-13523/national-organic-program-nop-sunset-review-2012; National Organic Program, Sunset Review (2013), 78 Fed. Reg. 61,154 (Oct. 3, 2013), https://www.federalregister.gov/articles/2013/10/03/2013-24208/national-organic-program-nop-sunset-review-2013.

[17] National Organic Program (NOP); Sunset Review (2012) for Nutrient Vitamins and Minerals, 77 Fed. Reg. 1980 (proposed Jan. 12, 2012),

Reviews and the nutrient vitamin Sunset Review, the National Organic Program utilized the same notice and comment process, initiating the relevant Sunset Review process with an ANPR, inviting public comment on the ANPR, following the ANPR with one or more National Organic Standards Board public meetings, publishing a proposed rule based on the recommendations of the National Organic Standards Board resulting from open discussion and votes taken at those public meetings, and finally, publishing a final Sunset Review rule.

83. Each of the ANPRs and proposed rules corresponding to the Sunset Reviews invited public comment and included a description of the standards and process utilized in the Sunset Review.[18]

***The Revised Sunset Review***

84. On September 16, 2013, Defendants published in the Federal Register the Notification of Sunset Process (Sunset Notice), which imposed new, mandatory standards and Sunset Review procedures.[19] No comment period was provided.

85. In the Sunset Notice, the National Organic Program states that the "Sunset Process described in [this Sunset Notice] will be used for future Sunset Reviews and renewals, unless [the Agricultural Marketing Service] replaces or updates this document. This document replaces the process that [the Agricultural Marketing Service] described in the first Advanced notice of Proposed Rulemaking (ANPR) for Sunset Review published in the Federal Register on June 17, 2005 (70 FR 35177)."[20]

---

https://www.federalregister.gov/articles/2012/01/12/2012-354/national-organic-program-nop-sunset-review-2012-for-nutrient-vitamins-and-minerals.

[18] *See, e.g.*, National Organic Program; Sunset Review (2008), 72 Fed. Reg. 73,667 (Dec. 28, 2007) (ANPR with req. for comments), https://www.federalregister.gov/articles/2007/12/28/E7-25270/national-organic-program-nop-sunset-review-2008; National Organic Program; Sunset Review (2008), 73 Fed. Reg. 40194 (proposed July 14, 2008), https://www.federalregister.gov/articles/2008/07/14/E8-15389/national-organic-program-nop-sunset-review-2008.

[19] National Organic Program, Sunset Process, 78 Fed. Reg. 56,811, 56,812 (Sept. 16, 2013) (notification of Sunset process).

[20] *Id.*

86. Significant substantive changes resulted from the Sunset Notice. While there are numerous issues with the changes implemented, the most problematic and at odds with the standards and directives of OFPA included the following:

- **Subcommittees—not the full, balanced National Organic Standards Board—conduct the sunset review in instances where proposals to remove do not arise.** This is problematic because (1) it vests the ultimate authority of deciding whether a material should be proposed for removal in the subcommittee (an unbalanced representation of the National Organic Standards Board), and (2) it only allows a vote of the full National Organic Standards Board for materials for which removal proposals are included in the preliminary review. If a material is not proposed for removal in the subcommittee's published preliminary review, then it will be considered untimely to make a motion to remove the material or present new information for consideration of the National Organic Standards Board.

- **"No additions" (7 U.S.C. 6517(2)) provision may be violated.** If the National Organic Standards Board does not cast a decisive vote to renew a synthetic material that has not been proposed for removal in the subcommittee's preliminary review, then USDA's decision to renew may actually be in conflict with the "no additions" provision because the decisive vote of the National Organic Standards Board concerning that synthetic was unconfirmed.

- **The default expiration standard is reversed to one of default retention.** This standard is undermined in three ways: (1) subcommittees must develop a proposal to remove materials; (2) National Organic Standards Board must cast a two-thirds decisive vote to remove, not renew; and (3) substance remains on the National List at Sunset unless the subcommittee proposes removal, the National Organic Standards Board votes to remove, and USDA accepts recommendation.

- **Public opportunity for input on sunset materials and National Organic Standards Board determinations is limited to first publication and meeting.** After the preliminary review is published, even if new information is presented or submitted, it will be considered untimely and a material cannot be proposed for removal during that sunset review.

- **Increases burden on public to apply limited exceptions standard and reduces incentive to seek and develop alternatives.** The burden is shifted to the public to make the case for why a material that is inherently in conflict with the organic standard should not be an exception to organic, rather than requiring the material to continually meet the criteria permitting its exception. This in turn removes the incentive for the organic industry to seek and develop materials that are truly organic and do not require an exemption.

87. In response to publication of the Sunset Notice, numerous groups issued statements opposing both the secretive and unilateral process behind developing and promulgating the substantive rule, as well as identifying numerous substantive issues within the rule that did not comply with OFPA. Because no comment period accompanied promulgation of the rule, objections to the Sunset Notice were issued in the form of press releases, op-eds, blogs,

letters, and address within the fall 2013 National Organic Standards Board meeting comments.[21] Objections raised included calls for the retraction of the rule so that it could be properly vetted through the public comment process.

88. Objectors were not limited to the organic community. On April 24, 2014, Senator Leahy and Representative DeFazio, original drafters of OFPA, sent a letter to Secretary Vilsack expressing their grave concern over both the substance and process of the Sunset Notice. In this letter, the Congressmen noted, "Perhaps the most alarming part of this sunset policy announcement was the decision by the agency to not subject this substantive policy change to full notice and comment rulemaking, a critical step to allow the public to provide scientific and market information to aid the Secretary and the National Organic Standards Board in fulfilling its statutory review duties. Had the agency engaged in the a full rulemaking process for the policy change, it would have given the Secretary the benefit of hearing about the strong objections to this change from the public, from many in the affected organic community, and from Members of Congress, such as ourselves."[22]

89. Despite these calls for retraction of the Sunset Notice from all corners of the organic community, National Organic Program made clear at the spring 2014 National Organic Standards Board meeting through public statements, presentations to the public, training materials and sessions for the National Organic Standards Board, and the mandated application of the process and standards established under the Sunset Notice to the 2015 Sunset Review materials that it would not retract the Sunset Notice and issue it subject to public notice and comment.

90. Moreover, because of USDA's failure to subject the Sunset Notice to the scrutiny and input of the organic community, substantive issues within the rule have resulted in

---

[21] *See, e.g.*, Joint Statement of Consumers Union, Food and Water Watch, Beyond Pesticides, and Center for Food Safety, U.S. Department of Agriculture Guts National Organic Law; Circumvents Public Process, *available at* https://consumersunion.org/wp-content/uploads/2013/09/USDA_Decison_on_National_List.pdf. Letter from National Organic Coalition, to Miles McEvoy, NOP-USDA (Nov. 4, 2013) (attached as Exhibit A).

[22] Letter from Sen. Patrick Leahy and Rep. Peter DeFazio, Congress of the United States, to Sec. Thomas J. Vilsack, Dept. of Agric. (April 24, 2014), http://www.cornucopia.org/USDA/LeahyDeFazioSunset.pdf.

inconsistent application of OFPA standards and confusion among the regulated community, and arbitrary and capricious actions on the part of the National Organic Program and Secretary in applying the very procedures and standards espoused in the Sunset Notice.[23]

91. USDA's issuance of the September 16, 2013, Sunset Notice without adherence to APA rulemaking requirements, including the offering of a public comment period, is arbitrary, capricious, and not in accordance with OFPA and the APA.

92. USDA's arbitrary and capricious actions and failure to utilize required rulemaking procedures weakens the integrity of the organic program by creating inconsistent organic production standards and causing injury to organic consumers, producers, certifiers, and others.

## FIRST CAUSE OF ACTION

### DEFENDANTS VIOLATED THE APA BY FAILING TO PROVIDE SUFFICIENT PUBLIC NOTICE AND COMMENT ON THE SUNSET NOTICE

93. Plaintiffs hereby incorporate paragraphs one through ninety-two as set forth herein.

94. The APA requires federal agencies to provide public notice of proposed rulemaking, and requires the agencies to give interested person an opportunity to participate in the rule making through the submission of data or arguments. 5 U.S.C § 553.

95. The Sunset Notice, published in the Federal Register on September 16, 2013, constitutes a substantive rule under the APA.

96. Promulgation and implementation of the procedures and standards set forth within the Sunset Notice constitutes final agency action, which impacts the legal obligations of the public and causes injury to the organic community.

97. Defendants' promulgation of a substantive rule and final agency actions described herein violate section 706 of the APA in that Defendants acted arbitrarily and capriciously,

---

[23] *See* Memorandum from Miles McEvoy to the National Organic Standards Board (NOSB) (Oct. 8, 2014), http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC5109177; U.S. Dept. of Agriculture, National Organic Standards Board Meeting, Transcript, Oct. 28-30, 2014, http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC5109861.

abused their discretion, and failed to act in accordance with the law by failing to adhere to section 553 of the APA and its implementing regulations.

98. Defendants' decision to promulgate a substantive rule concerning Sunset Review of materials on the National List without sufficient notice and public comment must be corrected to restore organic integrity.

## SECOND CAUSE OF ACTION

### DEFENDANTS' PROMULGATION OF THE SUNSET NOTICE WITHOUT SUFFICIENT NOTICE AND COMMENT CREATES INCONSISTENT ORGANIC STANDARDS AND VIOLATES OFPA

99. Plaintiffs hereby incorporate paragraphs one through ninety-eight as set forth herein.

100. USDA's promulgation and implementation of the Sunset Notice constitutes final agency action under 5 U.S.C. § 704. Defendants' final agency actions described herein violate section 706 of the APA, in that Defendants acted arbitrarily, capriciously, abused their discretion, and failed to act in accordance with the law by violating OFPA's overarching requirement to provide consistent organic production standards.

101. Defendants' decision to develop, promulgate, and implement inconsistent organic procedures which weaken the integrity of the organic label and injure the organic community, is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of standards required by law, in violation of OFPA.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that Defendants' September 16, 2013, Sunset Notice is a substantive rule under the APA and must adhere to APA rulemaking procedures;

B. Declare that the Defendants have violated the substantive rulemaking requirements of the APA by developing, promulgating, and implementing the September 16, 2013, Sunset Notice, without sufficient notice and public comment;

C. Declare that the Defendants have created an inconsistent organic standard, thus violating OFPA, by developing, promulgating, and implementing the September, 16,

2013, Sunset Notice procedures and standards without sufficient notice and public comment;

D. Enter an order vacating Defendants' rulemaking and mandating submission of the Sunset Notice to public comment;

H. Issue preliminary and permanent injunctive relief barring Defendants from implementing Sunset Notice procedures and standards during Sunset Review until APA rulemaking requirements have been met;

I. Award Plaintiffs their costs and reasonable attorneys' fees under the Equal Access to Justice Act or other applicable statute; and,

J. Grant Plaintiffs such further relief as the court deems to be just, proper, and equitable.

Respectfully submitted this 7th day of April, 2015.

/s/ Paige M. Tomaselli
PAIGE M. TOMASELLI (State Bar No. 237737)
SYLVIA SHIH-YAU WU (State Bar No. 273549)
Center for Food Safety
303 Sacramento Street, 2nd Floor
San Francisco, CA 94111
Phone: (415) 826-2770
Fax: (415) 826-0507
Emails: ptomaselli@centerforfoodsafety.org
swu@centerforfoodsafety.org

*Counsel for Plaintiffs*