UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR FOOD SAFETY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SONNY PERDUE, et al., <br><br> Defendants. | Case No. 15-cv-01590-HSG <br><br> **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. Nos. 96, 97 |

On April 7, 2015, a collective of non-profit organizations and commercial entities ("Plaintiffs") brought suit against representatives of the United States Department of Agriculture ("USDA"), the Agricultural Marketing Service, and the National Organic Program ("NOP") (collectively, "Defendants"), asserting claims for declaratory and injunctive relief under the Administrative Procedures Act ("APA"), 5 U.S.C. § 553, and the Organic Foods Production Act ("OFPA"), 7 U.S.C. §§ 6501–6523. Currently pending before the Court are the parties' motions for summary judgment. *See* Dkt. Nos. 96 ("Defs. Mot."), 97 ("Pls. Mot."), 99 ("Defs. Opp."), 100 ("Pls. Opp."). On November 9, 2017, the Court heard argument on the motions. After carefully considering the parties' arguments, the Court **GRANTS** Defendant's motion for summary judgment, and **DENIES** Plaintiff's motion for summary judgment.

**I.   BACKGROUND**

The basic facts are not in dispute. This case arises from a notice ("the Sunset Notice" or "the Notice") promulgated by USDA that alters the review process for determining which substances may be used in food certified as "organic" under the OFPA. The OFPA requires the Secretary of Agriculture ("the Secretary") to establish a "National List" of substances that fall into specific groupings, including synthetic substances permitted to be used in organic products

(referred to as "exempted substances"), and non-synthetic substances that are prohibited from use in organic products (referred to as "prohibited substances"). *See* Defs. Mot. at 2; 7 U.S.C. § 6517(b)-(c). The OFPA requires the National Organic Standards Board ("NOSB") to develop the National List for submission to the Secretary. The NOSB is composed of fifteen members appointed by the Secretary. The Secretary cannot exempt a synthetic substance unless the NOSB proposes to do so. 7 U.S.C. § 6517(d).

The OFPA also contains a "sunset provision," which provides that no substances on the National List are "valid unless the [NOSB] has reviewed such exemption or prohibition as provided in this section within 5 years." 7 U.S.C. § 6517(e). Prior to the Notice that triggered this lawsuit, USDA's regulations required the NOSB to consider public comments and vote on "the continuation of specific exemptions and prohibitions contained on the National List." NOP, Sunset Review, 70 Fed. Reg. 35,177 at 35,178 (June 17, 2005). Under that framework, a vote of two-thirds of the NOSB was required to recommend that a substance be renewed. *See* 7 U.S.C. § 6518(i). If two-thirds of the NOSB did not favor renewal, the substance expired and the Secretary was required to remove the substance from the National List. *See* Pls. Mot. at 5; 7 U.S.C. § 6517(d).

The USDA's September 16, 2013 notice enacted a new eight-step sunset review procedure. NOP, Sunset Process, 78 Fed. Reg. 56,811, 56,812 (Sept. 16, 2013). Pursuant to that new procedure, the full NOSB does not vote to renew each substance on the National List. *Id.* at 56,814. Instead, a NOSB subcommittee examines each substance set for sunset review and proposes to the full NOSB a list of substances to be removed from the National List. *Id.* It is only those substances that a NOSB subcommittee member proposes for removal, and that a member of the NOSB subsequently moves to remove, that are voted upon by the full NOSB. *Id.* A motion to remove must receive two-thirds of the votes cast by the NOSB to pass. *See* Defs. Mot. at 6. Once all motions have been voted on, the full NOSB completes its sunset review. 78 Fed. Reg. 56,814.

Following the NOSB's final vote, the NOSB Chair compiles all reviews and recommendations for removal, and transmits it to USDA for consideration. *Id.* USDA then examines this document, and if it elects to renew substances that have undergone sunset review,

2

USDA publishes in the Federal Register a list of all substances that are renewed for another five years on the National List. *Id.* If USDA initiates a proposed removal of a substance from the National List, USDA publishes in the Federal Register the proposal to remove a substance and requests public comment. *Id.* at 56,815. Based on comments received, USDA determines whether to finalize a substance's removal from the National List. *Id.*

Following issuance of the Notice, Plaintiffs filed this action for declaratory and injunctive relief. *See* Dkt. No. 1. On July 17, 2015, Defendants moved to dismiss the complaint for lack of jurisdiction, or alternatively, for failure to state a claim. Dkt. No. 16. The Court granted Defendant's motion on October 9, 2015, but provided Plaintiffs with leave to amend their complaint. Dkt. No. 49. On October 30, 2015, Plaintiffs filed the first amended complaint. Dkt. No. 50 ("FAC"). Defendants moved to dismiss the FAC, and the Court denied the motion. Dkt. Nos. 53, 61 ("Prior Order"). The parties finalized the Administrative Record on August 11, 2017. *See* Defs. Mot. at 8–9.

## II. DISCUSSION

Defendants move for summary judgment on two alternative grounds. First, Defendants argue that the Notice is not "final agency action" under the APA, and is therefore immune from judicial review. Defs. Mot. at 10–13. Second, if review is permissible, Defendants contend that the Notice satisfies the APA's procedural requirements and is fully consistent with the OFPA. *Id.* at 13–22. Plaintiffs also move for summary judgment on the merits of their OFPA and APA claims. Pls. Mot. at 10–24. Specifically, Plaintiffs argue that the Notice contravenes the substantive provisions of the OFPA, and is therefore arbitrary and capricious. In addition, Plaintiffs argue that the Notice violates the APA because it is a legislative rule enacted without prior notice-and-comment. The Court turns first to the issue of whether the issuance of the Notice is reviewable.

Final agency action is a prerequisite to judicial review under the APA. 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). As the parties acknowledged at oral argument, there is no dispute that this requirement applies to Plaintiffs' claims. *See also* Defs.

3

Mot. at 10; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the agency action in question must be final agency action.").

For agency action to be final, "the action must (1) 'mark the consummation of the agency's decisionmaking process' and (2) 'be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Id.* (quotation omitted). In applying *Bennett*'s principles "certain factors provide an indicia of finality, such as whether the action amounts to a definitive statement of the agency's position, whether the action has a direct and immediate effect on the day-to-day operations of the party seeking review, and whether immediate compliance with the terms is expected." *Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005) (quotation and alterations omitted).

Defendants argue that the Notice does not satisfy either of *Bennett*'s requirements for final agency action. Defs. Mot. at 9. Defendants claim that the Notice does not consummate the USDA's decisionmaking process regarding renewal or removal of substances from the National List; rather, the Notice simply alters the method by which substances are proposed for removal or renewal from the National List. *See* Defs. Mot. at 3–6, 11. Defendants similarly contend that the Notice does not itself impart or remove any public rights or legal obligations. *Id.* at 12–13. On the other hand, Defendants acknowledge that USDA's actual renewal or removal decision <u>does</u> constitute final agency action. *See id.* at 11–12. According to Defendants, Plaintiffs may accordingly challenge that "consummating" agency action. *See id.*

In response, Plaintiffs present three reasons why they satisfy *Bennett*. First, Plaintiffs argue that the Notice is final in that it "definitively mark[s] the consummation of USDA's process in overhauling the sunset review process." Pls. Mot. at 20; Pls. Opp. at 21. Second, Plaintiffs highlight that the Notice requires immediate compliance by USDA, even if final renewal and removal decisions are subsequently made. Pls. Opp. at 21–22. Third, Plaintiffs claim that the

4

Notice's change to voting procedures shifts the presumption in favor of automatic renewal, instead of removal. *See* Pls. Mot. at 13–14; Pls. Opp. at 21–22. Plaintiffs accordingly assert that this shift directly impacts their day-to-day operations, as new voting procedures will discourage individuals from participating in the sunset review process. *See* Pls. Opp. at 22; FAC, Ex. A, A–67. Plaintiffs also claim that this change will reduce the quality of organic foods by making it easier to include synthetic materials in organic products. Pls. Opp. at 26; *see* FAC Ex. B.

The Court concludes that the Notice is not reviewable final agency action. The Notice works a change to the method by which a substance is proposed for inclusion on the National List. That change is dispositive only of a follow-on substantive decision: the Secretary's renewal/removal determination. USDA's judgment on whether to renew or remove a substance, in turn, represents the agency's consummating action. The Notice does not itself alter any criteria or standards for the evaluation of a particular substance. Though Plaintiffs are correct that Defendants must immediately comply with the Notice's provisions, *see* Pls. Mot. at 20, that itself is not sufficient to create final agency action under the APA. *See Indus. Customers of Nw. Utilities*, 408 F.3d at 646 ("The fact that a statement may be definitive on some issue is insufficient to create a final action subject to judicial review."); *Ctr. For Food Safety v. Johanns*, 451 F. Supp. 2d 1165, 1188 (D. Haw. 2006) (finding that publication of "'coordinated, internal protocols relating to issuing of permits" was not final agency action because the procedures did not call for "any site-specific action" or "specific actions directly impacting the physical environment" (quotation and alterations omitted)).

Though the parties recognized at oral argument a lack of analogous binding authority, several decisions of the Ninth Circuit support the Court's conclusion. For instance, in *Indus. Customers of Nw. Utils v. Bonneville Power Admin.*, the Ninth Circuit held that there was no final agency action created by an agency's decision to commence a power rate hearing that in turn determined whether a power rate adjustment would be triggered. 408 F.3d 638, 641–42 (9th Cir. 2005). In that case, the Bonneville Power Administration ("BPA") had responsibility for deciding whether to hold an initial rate hearing. *Id.* The Federal Energy Regulatory Commission ("FERC") had limited authority to "affirm or remand" BPA's rate, but could not modify BPA's

5

proposed rate. *Id.* at 644. BPA argued that its trigger determination was not subject to judicial review until FERC confirmed and approved the rate, thereby rendering a final rate determination.

The *Industrial Customers* court agreed with BPA. It turned first to whether jurisdiction existed under the Northwest Power Act ("NPA"), which provided review of "final actions," including "final rate determinations" by FERC. The plaintiffs argued that FERC's limited role in the rate-setting process would deny them the "opportunity to challenge the BPA's trigger decision" once the rates were set. *Id.* at 645. Plaintiffs contended that independent review of the BPA's decision to commence a rate hearing was warranted. Notably, the Ninth Circuit stated:

> [T]he absence of FERC review does not preclude judicial review of the BPA's trigger determination after final FERC action. Indeed, the BPA concedes that the petitioners have the full right to judicial review of its trigger decision as part of the petition for review of the ultimate FERC rate decision.

*Id.* at 645. The Court therefore concluded that the petitions were not ripe, but would be "a proper part of a petition for review of the final FERC rate decision." *Id.*

Turning then to a "catchall" jurisdictional provision in the NPA, the *Industrial Customers* court considered whether the BPA's trigger determination comprised final agency action under the "more general doctrine of finality in administrative agency law." *See id.* (citing *Puget Sound Energy, Inc. v. United States,* 310 F.3d 613, 624 (9th Cir. 2002)). Following the two-step inquiry set forth in *Bennett*, the Court held that the BPA's trigger determination did not satisfy the test's first prong. Specifically, the Court found that the BPA's decision was merely "interlocutory," constituting only the "beginning of the decision-making process." *Id.* at 646. The court observed: "Although it is the predicate act for rate readjustment, the trigger determination itself has no final consequences. The trigger decision only determines whether a hearing will or will not occur." *Id.* at 647. Though recognizing that BPA's trigger determination could have "profound" economic consequences, the Court concluded that the plaintiffs could bring a judicial challenge only when FERC actually approved a rate readjustment. *Id.*

Similarly, in *F.T.C. v. Standard Oil Co. of California*, the U.S. Supreme Court held that the Federal Trade Commission ("FTC") did not act with finality by serving a complaint averring that it had "reason to believe" that the plaintiff had violated the Federal Trade Commission Act.

*See* 449 U.S. 232, 239 (1980). In reaching this holding, the Court observed that it had previously dealt with the APA's finality requirement in a "pragmatic way." *Id.* For instance, the Court found final agency action subject to judicial review in *Abbott Laboratories v. Gardner*, where the challenged action imposed a risk of "serious criminal and civil penalties" on non-compliant manufacturers. *Id.* at 242 (citing 387 U.S. 136, 149 (1967)). In contrast, the Court observed that FTC's averment was "materially different," in that it "represent[ed] a threshold determination that further inquiry is warranted and that a complaint should initiate proceedings." *Id.* at 240–41. The Court explained:

> To be sure, the issuance of the complaint is definitive on the question whether the Commission avers reason to believe that the respondent to the complaint is violating the Act. But the extent to which the respondent may challenge the complaint and its charges proves that the averment of reason to believe is not 'definitive' in a comparable manner to the regulations in *Abbott Laboratories* and the cases it discussed.

*Id.* at 241. Drawing on ripeness principles, the Court concluded that if and when the FTC made a final decision as to the plaintiff's liability, he could seek judicial review. *See id.* at 242 (observing that judicial review of the complaint "at the least is inefficient and upon completion of the agency process might prove to have been unnecessary . . . delay[ing] resolution of the ultimate question whether the Act was violated"). The Court recognized, moreover, that allowing for review at that early stage would entitle "every respondent to a Commission complaint" to judicial redress just by virtue of the agency's process. *Id.* at 242–43. The Court rejected that result, concluding that judicial review "should not be a means of turning prosecutor into defendant before adjudication concludes." *Id.* at 243.

The Ninth Circuit recently reaffirmed this reasoning in *Int'l Bhd. of Teamsters v. U.S. Dep't of Transportation*, 861 F.3d 944, 952 (9th Cir. 2017). In *Teamsters*, the Ninth Circuit considered the finality of three actions by the Federal Motor Carrier Safety Administration ("FMCSA"): first, the grant of a permit allowing an internationally-domiciled trucking company, Trajosa SA de CV ("Trajosa"), to operate in the United States; second, the denial of the plaintiff's challenge to the FMCSA's decision to grant that permit; and third, the issuance of a "Pilot Program Report," which set forth findings of a pilot study on which the FMCSA based its

permitting decision. *See* 861 F.3d at 947–49, 951–52. Considering each action in turn, the Ninth Circuit found that FMCSA's grant of Trajosa's permit was final agency action because it "marked the consummation of the agency's decisionmaking process to grant long-haul permits to Mexico-domiciled carriers." *Id.* at 952. The court reasoned that "[l]egal consequences flowed from the decision, because it allowed Trajosa to operate lawfully anywhere in the United States." *Id.* Similarly, the court held that the FMCSA acted with finality when it denied the plaintiff's challenge to Trajosa's permit: that denial "marked the consummation of the agency's resolution of the [the plaintiff's] challenge, and had legal consequences because it enabled Trajosa to proceed with its operations." *Id.* (citing *Wind River Mining Corp. v. United States*, 946 F.2d 710, 716 (9th Cir. 1991)).

In contrast, even though the FMCSA decided to accept applications pursuant to the Pilot Program Report, the *Teamsters* court concluded that the report was not final agency action. *Id.* The Ninth Circuit explained:

> The report had no legal consequences. To be sure, it was the final step in completing the pilot program, clearing the way for the permitting of Mexico-domiciled carriers. But the submission of the report did not change the legal situation, because the FMCSA maintained discretion over whether or not to begin issuing permits to Mexico-domiciled carriers. In other words, the FMCSA could have lawfully declined to issue permits <u>despite</u> completing the pilot program. Therefore, we may not review the Pilot Program Report, and must dismiss the petition challenging it.

*Id.* (emphasis in original and citation omitted).

The reasoning in *Teamsters* applies here with particular force. Like the Pilot Program Report, the NOSB voting process merely "clear[s] the way" for the agency's subsequent substantive decision: whether to actually remove or renew a substance on the National List. *See id.* Even Defendants admit that Plaintiffs can file suit when USDA undertakes its actual removal or renewal decision. Defs. Mot. at 11–12; *cf. Oregon Nat. Desert Ass'n*, 465 F.3d at 985–89 (finding reviewable agency procedures governing grazing licenses because the decision to license determined permittees' legal rights and concomitant enforcement actions). As with the FMCSA in *Teamsters*, individual NOSB members still have discretion to approve or deny a substance's renewal during sunset review. *See* 861 F.3d at 952. USDA also maintains discretionary authority

8

in deciding whether to accept NOSB's renewal or removal recommendation.

Plaintiffs argue that the Notice has a direct and immediate impact on their operations by shifting the presumption in favor of renewal, making it more likely that synthetic substances will be improperly incorporated into organic products. Pls. Mot. at 20–21, 24–26; Pls. Opp. at 20.[1]. Even accepting Plaintiffs' claim, this presumptive shift in no way guarantees that a substance is actually renewed or removed. In other words, there is no binding outcome or definitive result worked by the Notice's procedural change. Rather, it is the final renewal/removal determination that represents the agency's "last word from which binding obligations flow," and that has a "direct and immediate effect on the day-to-day business of" the relevant stakeholders. *Oregon Nat. Desert Ass'n.*, 465 F.3d at 990 (quotations and alterations omitted); *cf. Defs. of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1112 (D. Ariz. 2009) (reasoning that the agency's action was final because it was "couched in terms of an operating instruction," and that operating instructions are final because they represent the agency's "the last word on a discrete, site-specific action from which binding obligations flow that have a direct and immediate effect on the day-to-day business of the permit holders" (citing *Oregon Nat. Desert Ass'n,* 465 F.3d at 977, 984–86)).

Plaintiffs' challenge also presents ripeness concerns similar to those in *Teamsters*. Because Plaintiffs challenge a procedural change, as opposed to the agency's final removal/renewal decision, the harms identified in the FAC—for instance, the unlawful inclusion of certain compounds in organic foods—may never materialize. Plaintiffs' desired outcome might even occur should the NOSB vote against renewing a harmful substance. These scenarios illustrate that it would be premature for the Court to intervene at this stage. *See Sierra Club v.*

---

[1] For support, Plaintiffs rely on a list of voting tallies for synthetic substances taken at the fall 2015 NOSB meeting. *See* Plts. Mot. at 20–21, 25; FAC, Ex. B (providing a "list of substances and respective outcomes on motions to remove" synthetic ingredients from the National List). According to Plaintiffs, this document shows that the Notice has increased the propensity for harmful synthetics to enter organic products. Defendants argue that this document is not properly before the Court, as it contains post-decisional information outside the administrative record. *See Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012). Even if the Court considers this document, this list of substances and voting outcomes does not show that the Notice was dispositive for any member's particular vote: in other words, the list does not show that NOSB members would have voted differently (or that a substance would have appeared on the National List) but for the Notice. Nor does this table address the fact that USDA ultimately retains discretion to remove or renew a given substance.

9

*United States Nuclear Regulatory Comm'n*, 825 F.2d 1356, 1362 (9th Cir. 1987) ("We will not entertain a petition where pending administrative proceedings or further agency action might render the case moot and judicial review completely unnecessary."). This is particularly so given that Plaintiffs can incorporate their process-based claims into any future challenge to the agency's renewal/removal decision. *See* Defs. Opp. at 17 n.10; *City of San Diego v. Whitman* ("If and when the city is aggrieved by the EPA's decision regarding its application, the City's recourse is to appeal to the Environmental Appeals Board . . . It is the [Board's] decision that will constitute the 'consummation of the agency's decision-making process.'"). Plaintiffs do not explain how they are precluded from challenging the Notice if and when a harmful substance is wrongly renewed.

Plaintiffs' primary authorities can be distinguished on this basis. At oral argument, Plaintiffs identified *Salmon River Concerned Citizens v. Robertson* as providing Plaintiffs with some independent right to challenge USDA's internal procedural change. *See* Pls. Opp. at 24 n.8 (citing 32 F.3d 1346, 1348 (9th Cir. 1994)). In *Salmon River*, the Ninth Circuit held that citizen groups had standing to challenge a Final Environmental Impact Statement ("FEIS") prepared by the U.S. Forest Service, which authorized "district foresters" to use herbicides on certain National Forest lands. *See* 32 F.3d 1348, 1355. Drawing on its prior decision in *Idaho Conservation League v. Mumma*, the Ninth Circuit rejected the Forest Service's position that a challenge to the FEIS would not be ripe "until a district forester authorizes a specific herbicide application, because only a specific herbicide application would harm [the plaintiffs]." *Id.* at 1355 (citing 956 F.2d 1508, 1515 (9th Cir. 1992)). The *Salmon River* court read *Idaho Conservation League* as holding that:

> [P]laintiffs need not wait to challenge a specific project when their grievance is with an overall plan. If the agency action only could be challenged at the site-specific development stage, the underlying programmatic authorization would forever escape review. To the extent that the plan pre-determined the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge. That point is now, or it is never.

*Id.* (alterations and quotations omitted). The court in *Salmon River* subsequently held that "[t]o the extent that the FEIS here sets guidelines that determine future herbicide applications, the

Service's failure to comply with NEPA represents a concrete injury." *Id.* The court accordingly found that the challenged FEIS was "ripe for review." *Id.*

The issues presented in *Salmon River* are different from those in this action in several respects. First, the *Salmon River* court addressed whether the plaintiff's harm was cognizable in the context of standing; the court did not squarely address the issue of finality. Second, and assuming that the court's reasoning applies, the Notice does not "pre-determine" USDA's actual renewal/removal decision. As discussed above, the Notice does not alter any substantive criteria for deciding which substances are included on the National List, and USDA retains ultimate discretion over whether to accept NOSB's renewal recommendation. Defs. Mot. at 15–16. Third, Plaintiffs here are not precluded from asserting procedural harms stemming from the Notice in a suit challenging a substance's allegedly wrongful renewal. Plaintiffs must accordingly await that decision for the Court to properly review USDA's actions.[2]

## III. CONCLUSION

For these reasons, the Court **GRANTS** Defendants' motion for summary judgment, and **DENIES** Plaintiffs' motion. The clerk is directed to enter judgment in accordance with this order in favor of Defendants and to close the case.

**IT IS SO ORDERED.**

Dated: 5/24/2018

HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[2] Because the Court concludes that it lacks jurisdiction to review USDA's actions, the Court does not address the merits of Plaintiff's APA and OFPA claims. *See* Defs. Mot. at 10.

11